J-A07039-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.J.R., III, A MINOR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.R., FATHER | : | No. 2458 EDA 2022 |

Appeal from the Decree Entered August 31, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000578-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: J.M.R., A MINOR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.R., FATHER | : | No. 2459 EDA 2022 |

Appeal from the Decree Entered August 31, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000580-2019

BEFORE:    DUBOW, J., McLAUGHLIN, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:                    **FILED MAY 1, 2023**

Appellant, C.R. (Father), appeals from the August 31, 2022, decrees entered in the Philadelphia County Court of Common Pleas, involuntarily terminating his parental rights to his sons, C.J.R., III (C.), born in August of 2012, and J.M.R. (J.), born in December of 2014 (collectively, the Children).[1]

---

[1] While the trial court's opinion states the parental rights of the Children's mother, S.M.J. (Mother), were previously involuntarily terminated on May 24, 2022, the August 31, 2022, notes of testimony indicate they were terminated on November 16, 2021.  *See* Trial Ct. Op., 11/1/22, at 1; N.T., 8/31/22, at 3.  In any event, Mother did not appeal.

Father argues: (1) the trial court's decision to terminate under subsections 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8) was not supported by clear and convincing evidence; and (2) termination does not best serve the Children's needs under Subsection 2511(b).[2]  We affirm.

## I.  Facts & Procedural History

We glean the following relevant facts and procedural history from the trial record, the August 31, 2022, notes of testimony, and the trial court's opinion.  In December of 2014, on the day after J.'s birth, the Philadelphia Department of Human Services (DHS) received a general protective services (GPS) report, alleging J. was born prematurely at 28 weeks' gestation, and both he and Mother tested positive for methadone, opiates, and benzodiazepines.  *See* Trial Ct. Op., 11/1/22, at 2-3, 20.  Mother admitted to having a history of heroin and crack cocaine use, and to using heroin the previous month.  *Id.* at 3.  J. was hospitalized in the neonatal intensive care unit for two months.  *Id.*

On April 9, 2015, DHS filed dependency petitions for J., as well as his siblings, C. and A.L.R. — the latter of whom is not involved in this appeal.  At this time, J. was three months old and had a heart monitor due to his medical

---

[2] The Children's guardian *ad litem* (GAL), Andrew Martino, Esquire, has filed a brief in support of affirming the termination decrees.  The Children's legal interests were represented by Susan Rubinovitz, Esquire, who has not filed a brief.

issues, and C. was approximately two and a half years old. *See* Trial Ct. Op. at 5. On May 14th, the trial court adjudicated all three children dependent but directed that they remain in Mother's care under DHS supervision. At this time, the trial court also

> referred Father to the Clinical Evaluation Unit (CEU) for a forthwith drug screen and a dual diagnosis assessment[, and] ordered that if Father's drug screen was negative, that [J.] could be moved to Father's home prior to the next hearing[. The Community Umbrella Agency-Asociacion Puertorriquenos en Marcha [(CUA-APM)] was ordered to complete a home assessment and clearances of the home where [C.] resided[[.]

*Id.* at 5.

C. began residing with his (and J.'s) paternal grandmother, M.R., in December of 2015, under DHS supervision. Trial Ct. Op. at 6. M.R. was subsequently approved as a kinship provider. *Id.*

Meanwhile, "Father has been in and out of prison throughout the life of this case," although specific dates of incarceration are not apparent from the record. *See* Trial Ct. Op. at 20. At the September 15, 2016, permanency review hearing, the trial court directed "CUA to make outreach to Father," and permitted M.R., the grandmother, to take the Children to visit Father in prison. *Id.* at 7. On May 5, 2017, Father participated in a single case plan (SCP) meeting. His objectives were to: make his whereabouts known; report to the CEU for an assessment and random drug testing; participate in housing and parenting programs with the Achieving Reunification Center (ARC); and attend supervised visits with the Children. *See id.* at 8; N.T., 8/31/22, at 6. This

appears to be the only SCP meeting that Father participated in. **See** Trial Ct. Op. at 11-15 (Father failed to participate in SCP meetings on May 23, 2018, February 4 and December 16, 2019, May 29 and December 21, 2020, and June 8 and 28, 2021). At the time of the December 6, 2018, permanency review hearing, Father's whereabouts were unknown. **Id.** at 8.

By the time of the April 19, 2018, permanency review hearing, C. remained in placement with the paternal grandmother, M.R. Trial Ct. Op. at 9. J., however, was found **not** to be a dependent child, and supervision over him was discharged. Twelve days later, however, on May 1st, CUA-APM learned that on April 27th, Mother had left J. and his older sibling A.L.R. in the care of two different friends, then failed to retrieve the Children or respond to the friends' calls. **Id.** The following day, CUA-APM made telephone contact with Mother, who stated she was "terminated from her long-time methadone maintenance program but would not provide a clear answer" why. **Id.** Over the next several days: CUA-APM visited Mother's home, but "she did not answer the door" and did not respond to their telephone calls; and the friends, who were caring for J. and A.L.R., were determined not to be appropriate caregivers. **Id.**

Accordingly, J. and A.L.R. were placed in the care of M.R., the paternal grandmother. Trial Ct. Op. at 10. On May 29, 2018, J. was re-adjudicated a dependent child. **Id.** at 11. It appears Father was incarcerated at that time. By the July 18, 2018, permanency review hearing, the Children were

"medically up to date and [did] not receive any services." At the November 6, 2018, hearing, Father was granted supervised visits with the Children at the agency. *Id.* at 12.

At the February 6, 2019, permanency review hearing, the Children were doing well, but DHS was "to continue in family finding . . . specifically to locate appropriate family members for Children." Trial Ct. Op. at 12. ACS "did PLS [a parent locator search] on Father" and determined his address in Philadelphia. *Id.*

## II. Termination Petitions & Hearing

On August 2, 2019, DHS filed petitions to involuntarily terminate both Mother's and Father's parental rights, averring they had not achieved full and continuous compliance with their plan objectives. Nevertheless, the trial court held permanency review hearings in: August and December of 2019; March, July, and October of 2020; and January, March, and May of 2021. By the December 17, 2019, hearing, Father was incarcerated, and at the July 28, 2020, hearing, a PLS was "ordered for" him. *Id.* at 13.

On September 24, 2020, DHS received a GPS report alleging: M.R., the paternal grandmother, was neglecting the Children; J. was diagnosed with autism but M.R. had not sought treatment for him; M.R. was prescribed suboxone and may be selling her prescription, and she was diagnosed with bipolar disorder but was not in treatment; and M.R. used "a gate to keep [J.]

out of the kitchen because he has a habit of 'raiding' the refrigerator." Trial Ct. Op. at 14. That same day, they were placed together in foster care. *Id.*

At the next permanency review hearing, on October 28, 2020, the trial court directed that Father would have supervised visitation for one hour, and weekly and bonding evaluations would be conducted with both parents. At that same hearing, as well as the next, on March 16, 2021, the court ordered that Father would be referred to CEU for an evaluation. Trial Ct. Op. at 14-15. By the time of the next hearing on May 25, 2021, hearing, however, Father was incarcerated. *Id.* at 15. The permanency review order for this hearing stated Mother was in moderate compliance with her plan objectives, and that DHS withdrew its "goal change petitions as reunification is still viable with Mother." Trial Docket, CP-51-DP-0000929-2015 (J.), at 103; Trial Docket, CP-51-DP-0000930-2015 (C.), at 93. It is not clear whether these "goal change petitions" and the August 2, 2019, termination petitions are one and the same.

In any event, on November 15, 2021, DHS again filed petitions for the involuntary termination of both Father's and Mother's parental rights to C. and J., pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[3] Mother's

---

[3] At the termination hearing, however, counsel for DHS referred only to earlier-filed termination petitions of August 2, 2019. *See* N.T. at 2.

parental rights were terminated, possibly on November 16, 2021, or May 24, 2022. *See* Trial Ct. Op. at 1; N.T. at 3.

On August 31, 2022, the trial court conducted an evidentiary hearing on the termination petition as to Father's parental rights. The Children were then residing in separate foster homes, although the record does not readily indicate when they were placed there. *See* N.T. at 11-12. C. was in fifth grade, was in a treatment foster home, had an IEP, and was attending "CCTC" weekly for therapy. *Id.* at 11, 12, 14. J. was in kindergarten, was in a general foster home, had been evaluated for an IEP, and was "on a waiting list for guild guidance for individual therapy." *Id.* at 15. They did not appear at the hearing, but both their guardian *ad litem* and legal counsel were present.

DHS presented one witness, CUA-APM case manager Tyeshia Grassy, who had been involved in the Children's case since 2018. She testified to the following: the Children initially came into care at the end of 2014, due to Mother and J.'s both testing positive for illegal substances at the time of J.'s birth. N.T. at 4. APM had been providing services to the family since 2016. *Id.* at 5. When Father was incarcerated, CUA made outreach to him. *Id.* His plan objectives were: to make his whereabouts known; following release from prison, to report to CEU for an assessment and random drug screen; to contact CUA to arrange visitation and to visit the Children; and to participate in ARC's housing and parenting programs. *Id.* at 6. Father understood that compliance with all of these objectives was required for reunification. *Id.* at

5-6. In the periods when Father was not incarcerated, CUA attempted to refer him to the CEU for evaluations and ARC for services, but he did not attend. *Id.* at 6-7. Father was released from prison and had been at a recovery house since July 27, 2022 (approximately five weeks before the hearing), but he did not contact CUA until August 18th (one week before the hearing). *Id.* at 9. Caseworker Grassy believed Father was employed, but he has not provided proof. *Id.* at 8.

With regard to visitation, Caseworker Grassy testified that since 2018, Father attended three visits at the agency, the most recent of which was one week earlier. N.T. at 8-9. The visits "were fine" and had "no issues." *Id.* at 9. The Children did not appear to be upset when the visits were over, and when asked whether they had a child/parent bond with Father, Caseworker Grassy replied, "[N]o, it was more so [sic] the [C]hildren were playing." *Id.* at 9-10. The paternal grandmother did report that Father was visiting the Children when he was not incarcerated, but the Children were removed from her home approximately two years earlier, in September of 2020. *See id.* at 10. Caseworker Grassy had concerns about reunification due to Father's "consistent" incarceration. *Id.* at 11. Meanwhile, each Child had a loving parent/child relationship with his respective foster parent and was stable and doing well in his foster home. *Id.* at 12-13. The Children had "child prep services to . . . explain the adoption process" and both indicated they wished to be adopted. *Id.* at 16.

The Children's legal counsel stated she had video visits with each child separately, and they similarly told her they wished to be adopted. N.T. at 18.

Father testified to the following: within three days of being released from prison, he "call[ed] to set up a visit with [the C]hildren" and did not get a response, but on a second call, was able to talk to Caseworker Grassy. N.T. at 19-20. Father's residence at the recovery house was not mandatory, but rather optional, and he intended to stay there six months "to ease back into reality and get back on [his] feet." *Id.* at 20. Father was working full time in construction and all of his random drug screens were negative. *Id.* at 19. On the same day as the hearing, Father had an appointment at ARC. *Id.* at 20. Previously, through 2020, he visited the Children's at his mother's house every day, and was active in their lives. *Id.* at 20-21. Father testified he and the Children loved each other and had an important relationship, and he did not want them to be adopted. *Id.* at 21.

Following the presentation of evidence, the trial court found DHS had established grounds for termination under Subsections 2511(a)(1), (2), (5), (8), and (b), and involuntarily terminated Father's parental rights. He timely filed separate notices of appeal along with Pa.R.A.P. 1925(a)(2)(i) concise statements of errors complained of on appeal. The trial court issued an opinion, and this Court *sua sponte* consolidated the two appeals.

### III. Father's Issues & Relevant Law

Father raises the following issues for our review:

1. Did the Trial Court err in terminating [Father's] parental rights under 23 Pa.C.S. [§] 2511(a)(1), 2511(a)(2), 2511(a)(5), and 2511(a)(8)?

2. Did the Trial Court err in finding that termination of [Father's] parental rights best served the [C]hildren's developmental, physical and emotional needs under 23 Pa.C.S. [§] 2511(b)?

Father's Brief at 7.

The relevant scope and standard of review are as follows:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. [We] accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the lower court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will." Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. "We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence."

*In re Adoption of C.M.*, 255 A.3d 343, 358-59 (Pa. 2021) (citations omitted).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis. 23 Pa.C.S. § 2511. The trial court must initially determine whether the conduct of the parent warrants termination under Section 2511(a). It so, then the court "consider[s] whether termination would best serve 'the developmental,

- 10 -

physical and emotional needs and welfare of the child' under Subsection 2511(b)." ***In re Adoption of C.M.***, 255 A.3d at 359.

> [T]he burden of proof is upon the party seeking termination to establish by "clear and convincing" evidence the existence of the statutory grounds for doing so. "[C]lear and convincing evidence is defined as testimony that is so 'clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'"

***Id.*** at 358 (citations omitted). We need only agree with any one subsection of Section 2511(a), along with Section 2511(b), to affirm the termination of parental rights. ***In re Adoption of K.M.G.***, 219 A.3d 662, 672 (Pa. Super. 2019) (*en banc*) (citation omitted).

Pertinently, Subsections 2511(a)(2) and (b) provide:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> \* \* \*
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> \* \* \*
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S. § 2511(a)(2), (b).

The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct, but include acts of refusal and an incapacity to perform parental duties. *In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021) (citation omitted). This Court has explained:

> Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control[,] or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.
>
> [W]hen a parent has demonstrated a continued inability to conduct his[, or her] life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified." "A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous."

*Id.* at 1104-05 (citations omitted). A parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa. Super. 2017) (citation omitted).

- 12 -

With respect to a parent who is incarcerated, the Pennsylvania Supreme Court has held:

> "[I]ncarceration neither compels nor precludes termination." Instead, . . . incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

*In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012) (citations omitted).

## IV.  Subsection 2511(a)(2)

Here, with respect to Section 2511(a)(2), Father argues DHS failed to present clear and convincing evidence that the causes of the Children's incapacity, neglect or refusal cannot or will not be remedied.  Father's Brief at 15.  Father maintains he: was released from incarceration "less than a month prior to the hearing[;]" "had taken steps to comply with all of CUA's single case plan objectives[;]" "obtained full time employment in order to . . . support his children[;]" "signed up for parenting . . . and housing classes at [ARC] and had all negative drug screens."  *Id.* at 14-15.  Father contends he has "demonstrated a serious intent, willingness, and capacity to care for his children" and termination "would be detrimental to these children[,] who are bonded with" him.  *Id.* at 14.  After careful review, we conclude Father is not entitled to relief.

The trial court summarized the testimony, as we have set forth above, and credited Caseworker Grassy's testimony, but found Father not credible.

- 13 -

*See* N.T. at 21-22; Trial Ct. Op. at 25. The court found, "[F]ather was never an active figure in [the Children's] lives, notwithstanding his own testimony[,] which is self-serving, and not really believable." N.T. at 21-22. At the hearing, the court reasoned:

> The objective facts are that [the Children] came into care [in] 2014. [Father] remained an absent figure in their lives[;] he remained on the periphery of their lives and never remedied any of the issues that brought the [C]hildren into care; never put himself in the position to care for the [C]hildren. And . . . today in court he says . . . I'm going to give myself about six months to figure out where I'm heading, and in the meantime, I want the [C]hildren to wait for me to straighten out my life, so they can come live with me. That's not the way it works.
>
> Children are not asked to wait until you figure out who and what you want to be. Children need and require parental contact and they apparently have it with their current caregivers. . . .

*Id.* at 22.

> In its opinion, the trial court further explained:
>
> [E]ven though there was no affirmative act of Father that resulted in the Children being forced into foster care, Father was not present and active in their care. His absence caused them to be without essential parental care and control.

Trial Ct. Op. at 24. Furthermore, the court considered that incarceration did not toll Father's responsibilities, and he did not present any evidence that he utilized resources while in prison. *Id.*

Based on this record, we conclude the trial court did not abuse its discretion in finding grounds for termination under Subsection 2511(a)(2). The only evidence of any compliance with the objectives was Father's three supervised visits, the most recent of which was made one week before the

- 14 -

termination hearing, and the testimony that Father previously visited the Children at his mother's house when he was not incarcerated. Even those visits, however, ended two years earlier when the Children were removed from the grandmother's home.

We reiterate, "Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." **In re K.M.W.**, 238 A.3d 465, 474 (Pa. Super. 2020) (*en banc*) (citation omitted). Additionally, "a parent's 'recent efforts to straighten out [his] life' upon release from incarceration does not require that a court 'indefinitely postpone adoption.'" **Id.** (citation omitted). We conclude the trial court did not err in finding clear and convincing evidence that Father's incapacity, neglect, or refusal cannot or will not be remedied pursuant to Section 2511(a)(2).[4]

## V. Subsection 2511(b)

In his second issue, Father argues the evidence was insufficient to support termination under Subsection 2511(b). He reiterates he was recently released from prison and working to achieve reunification. Father's Brief at 17. In addition, Father asserts he is "willing and able to provide a loving and

---

[4] Because we can affirm the grounds for termination under Section 2511(a)(2), we need not consider Father's arguments with respect to Section 2511(a)(1), (5), and (8). **See Adoption of K.M.G.**, 219 A.3d at 672.

stable home" and that it "would be better for the [C]hildren to be together with Father than separated in two different homes." *Id.* No relief is due.

With respect to Subsection 2511(b), this Court has stated:

[T]he court must consider whether termination will meet the child's needs and welfare. "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond."

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Adoption of M.A.B.*, 166 A.3d at 444 (citations omitted).

Furthermore:

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. The mere existence of an emotional bond does not preclude the termination of parental rights. Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." . . .

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child

- 16 -

> bond can be severed without detrimental effects on the child.

***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011) (citations omitted).

Our Supreme Court has also stated, "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." ***In re T.S.M.***, 71 A.3d 251, 268 (Pa. 2013). In weighing Subsection 2511(b) factors, "courts must keep the ticking clock of childhood ever in mind," where "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly." ***Id.*** at 269.

Here, there was no evidence that C., age 10, or J., seven years old, ever lived with Father. There is no evidence, aside from Father's testimony — which the court found self-serving and not credible — that he performed his parental duties, and there was no evidence where he would live following the recovery house. ***See*** N.T. at 20-22. Caseworker Grassy testified she observed the first two supervised visits between Father and the Children, the dates of which are not apparent from the record. ***See id.*** at 9. Although the caseworker stated there was "no issues" during the visits, she also opined she did not observe the existence of a parent-child bond. ***Id.*** at 9-10. Rather, Caseworker Grassy testified, she has observed a parent-child bond between the Children and their respective foster parents, who are pre-adoptive resources. ***Id.*** at 11-13. Further, Caseworker Grassy confirmed that the Children are doing "very well" in their foster homes. ***Id.*** at 13. Although the

Children "know their dad," they both wished to be testified. *Id.* at 16-17. Caseworker Grassy concluded the Children would not suffer irreparable harm if Father's parental rights were terminated. *Id.* at 11.

Based on the foregoing and the totality of the record evidence, we discern no abuse of discretion by the trial court in concluding that terminating Father's parental rights will serve the Children's developmental, physical and emotional needs and welfare pursuant to Section 2511(b).

### VI. Conclusion

Accordingly, we affirm the termination decrees pursuant to 23 Pa.C.S. § 2511(a)(2) and (b).

Decrees affirmed.

Judge McLaughlin joins the Memorandum.

Judge Dubow Did Not Participate.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/1/2023